**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES MONEY, WILLIAM RICHARD, GERALD REED, AMBER WATTERS, TEWKUNZI GREEN, DANNY LABOSETTE, CARL REED, CARL "TAY TAY" TATE, PATRICE DANIELS, and ANTHONY RODESKY, on behalf of themselves and all similarly situated individuals, | ) ) ) ) ) ) ) ) | |
| Petitioners, | ) ) ) | Case No. |
| v. | ) ) | |
| ROB JEFFREYS, in his official capacities as DIRECTOR OF THE ILLINOIS DEPARTMENT OF CORRECTIONS, | ) ) ) ) | |
| Respondent. | ) | |

**EMERGENCY PETITION
FOR WRITS OF HABEAS CORPUS**

James Money, William Richard, Gerald Reed, Amber Watters, Tewkunzi Green, Danny Labosette, Carl Reed, Carl "Tay Tay" Tate, Patrice Daniels, and Anthony Rodesky ("Petitioners"), on behalf of themselves and others similarly situated, and by and through their attorneys, allege as follows:

## I.    PRELIMINARY STATEMENT

1.      Without urgent action by the Illinois Department of Corrections ("IDOC") to drastically reduce Illinois' prison population, the novel coronavirus is likely to spread not just inside the walls of Illinois's 28 prisons, but throughout prison communities as well.  Nearly 37,000 people are incarcerated in Illinois, living in close quarters where all aspects of daily life,

including healthcare and food service, take place. As with other congregate settings like nursing homes and long-term care facilities, social distancing guidelines can never be fully or effectively implemented in prison. And each day, thousands of staff must come and go from prison facilities, potentially carrying with them the novel coronavirus for days, even weeks, without ever showing symptoms. These settings pose a particular risk of spreading the virus, with catastrophic consequences not just to the prisoners and staff, but also to their communities and the hospitals that serve them.

2.      To understand the devastating impact that COVID-19 will have on the Illinois prison system and the communities that house those prisons, one need look no further than Joliet, Illinois. On March 25, 2020, the IDOC announced the first confirmed case of COVID-19 at Stateville Correctional Center. Just five days later, Dr. Ngozi Ezike announced that twelve prisoners had been hospitalized with confirmed cases of COVID-19, while another 77 prisoners demonstrated symptoms but had not yet been confirmed. That same day, St. Joseph Hospital, where Stateville prisoners had been hospitalized, announced it was "overwhelmed" by inmates suffering from the effects of coronavirus and staff already were "maxed out." The hospital's medical director characterized the situation as "a disaster." The following day, Governor Pritzker confirmed at least one prisoner had died from the virus, while the number of confirmed cases among staff and prisoners continues to grow.

3.      Stateville's reality might have been avoided if the Governor and IDOC had acted with the urgency and scope required to mitigate the oncoming harm. Instead, IDOC has continued to house thousands of elderly, disabled, and medically vulnerable prisoners who could be released, many of whom are approaching their release dates and have homes in which they could more safely quarantine. To effectively prevent the continued spread of the COVID-19 infection

2

in prison communities, the state must take urgent steps to release, furlough, or transfer to home detention all that qualify under the law, and particularly those who are elderly and medically vulnerable.

4.     Every single person in IDOC custody faces a substantially increased risk of harm as a result of the Respondent's failure take reasonable measures to stop the spread of COVID-19 by refusing to reduce the number of people living in IDOC custody through the implementation of medical furlough, transfer to electronic monitoring/home detention, and other mechanisms to reduce the prison population. Even people who lack an available pathway to release are harmed because their likelihood of contracting the virus is substantially increased and their ability to access preventative sanitation resources and medical care is adversely affected.

5.     Petitioners and similarly situated medically vulnerable individuals and those with pathways to release must be released now. Now is the time to act to stop the spread of COVID-19 inside the prisons, and to protect the individuals who live and work in the prisons as well as the broader community from the serious risk of harm to their health and safety. The State is not acting with sufficient urgency, and without intervention from this Court, people are going to die unnecessarily.

## II.  PARTIES

6.     Petitioner James Money (S11097) is 28 years old and is housed at Illinois River Correctional Center in Canton, Illinois. He is eligible for medical furlough pursuant to 730 ILCS 5/3-11-1, release through an award of good time pursuant to 20 Ill. Adm. Code 107.210, and transfer to home detention pursuant to 730 ILCS 5/5-8A-3(b). Mr. Money is a member of Subclasses 1, 5, and 6.

3

7.     Petitioner William Richard (M52774) is 66 years old and lives in the healthcare unit at Dixon Correctional Center.  Mr. Richard has less than four months remaining on his sentence, and is eligible for transfer to home detention under 730 ILCS 5/5-8A-3(d).  Mr. Richard is a member of Subclasses 1, 2, 3, and 6.

8.     Petitioner Gerald Reed (N32920) is 57 years old and housed at the Northern Reception Center.  Mr. Reed has heart failure, hypertension, is pre-diabetic, and uses a wheelchair for mobility.  Mr. Reed is eligible for medical furlough at his mother's home.  Mr. Reed is a member of Subclasses 1 and 2.

9.     Petitioner Amber Watters (Y39454) is 30 years old and is housed at Logan Correctional Center in Lincoln, Illinois. She is serving two three-year sentences for low level drug offenses out of Livingston County, and is eligible for transfer to home detention under 730 ILCS 5/5-8A-3(e).  Ms. Watters is a member of Subclass 4.

10.     Petitioner Tewkunzi Green (R84568) is 38 years old, and housed at Logan Correctional Center in Lincoln, Illinois.  She suffers from asthma and severe hypertension, and is eligible for medical furlough under 730 ILCS 5/3-11-1. Ms. Green is a member of Subclass 1.

11.     Petitioner Danny Labosette (B23629) is 56 years old and currently housed at Robinson Correctional Center in Robinson, Illinois.  Mr. Labosette is a double amputee and suffers from untreated Hepatitis C. Mr. Labosette is eligible to be transferred to home detention under 730 ILCS 5/5-8A-3(d). Mr. Labosette is a member of Subclasses 1, 2, and 3.

12.     Petitioner Carl Reed (R48993) is 59 years old, and currently housed at Graham Correctional Center in Hillsboro, Illinois.  He suffers from chronic kidney disease—requiring dialysis three days per week—diabetes, hypertension, and underlying neurological impairments.

Mr. Reed is eligible for medical furlough pursuant to 730 ILCS 5/3-11-1. Mr. Reed is a member of Subclasses 1 and 2.

13.     Petitioner Carl "Tay Tay" Tate (R12529) is a 40-year-old transgender woman diagnosed with Gender Dysphoria, who is housed at Danville Correctional Center. Ms. Tate lives with hypertension, for which she takes medication. Ms. Tate is a member of Subclass 1.

14.     Petitioner Patrice Daniels (B70662) is 45 years old, serving a life sentence and not eligible for release. Mr. Daniels is a member of the Class.

15.     Petitioner Anthony Rodesky (R47057) is 49 years old and currently housed at Pontiac Correctional Center in Pontiac, Illinois. He has diabetes and other chronic health conditions, and in 2015 he had a below-knee amputation. Mr. Rodesky is a New Jersey prisoner who is in Illinois custody pursuant to an interstate compact agreement. Mr. Rodesky is a member of the Class.

16.     Respondent Robert Jeffreys is the Director of the Illinois Department of Corrections.

## III.     JURISDICTION AND VENUE

17.      The Petitioners bring this action pursuant to 28 U.S.C. § 2254 for relief from custody in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution. *See Walker v. O'Brien,* 216 F.3d 626, 633 (7th Cir. 2000) ("Roughly speaking, this makes § 2254 the exclusive vehicle for prisoners in custody pursuant to a state court judgment who wish to challenge anything affecting that custody.").

18.     The Court has subject matter jurisdiction over this Petition pursuant to Article I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause); the Eighth and the Fourteenth Amendments to the U.S. Constitution; 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1651 (All Writs

Act); and 28 U.S.C. § 2254 (habeas corpus).  In addition, the Court has jurisdiction to grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

19.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to these claims occurred and continue to occur in this district.

## IV.     EXHAUSTION OF ADMINISTRATIVE REMEDIES

20.     Petitioners are excused from exhausting state court remedies because Illinois courts are functionally unavailable to hear their petition for urgent release.  COVID-19 has proven to be an unprecedented assault on the normal functioning of society as a whole, including the state legal system.  Indeed, in an effort to reduce the spread of COVID-19 and protect public health, Chief Judge Evans issued an order on March 13, 2020, postponing most cases in the Circuit Court of Cook County through April 16, 2020.  On March 30, 2020, Chief Judge Evans extended that order through May 18, 2020.  *See* Circuit Court of Cook County General Order 2020-01.  Similar orders have been issued throughout the state.  Given the reduced operations of the state courts, Petitioners are unlikely to obtain timely relief from the state courts before contracting—and potentially dying from—COVID-19.

21.     Federal habeas corpus exhaustion requirements are waived when "there is an absence of available State corrective process, or circumstances exist that render such process ineffective to protect the rights of the applicant."  28 U.S.C. § 2254(b)(1)(B)(i)-(ii).  While Petitioners have attempted to exhaust available state court remedies, the reality remains that the state corrective process is not currently available, and the imminent danger presented by COVID-19 renders the delayed state court process ineffective.

### A.  Absence of a Corrective Process

6

22.     Petitioners are excused from exhausting state court remedies that are not available to them.  *See U.S. ex rel. Morgan v. Sielaff*, 546 F.2d 218, 222 (7th Cir. 1976).  Here, mandamus is the only state process ostensibly available to petitioners to raise their claims[1]—yet even that process is effectively unavailable due to the current circuit court closures.  Given the emergency nature of their request, and in an effort to exhaust despite the circuit court closures, Petitioners have brought a parallel petition before the Illinois Supreme Court requesting a writ of mandamus requesting urgent release.  At this time of filing of the present petition, it is unclear whether the state supreme court will allow Petitioners to move forward in that proceeding given its urgency and the current circuit court closures.

23.     The unavailability of state corrective process does not and has never prevented federal review of a habeas claim.  The effective closure of the Illinois court system to Petitioners means that there is no appropriate remedy in the state courts to address their claims. The exhaustion requirements in Section 2254 do not "bar from federal habeas prisoners in states whose post-conviction procedures are technically inexhaustible."  *Castille v. People*s, 489 U.S. 346, 350 (1989).  "If an appropriate remedy does not exist or its utilization is frustrated by the state system, ... [t]he deference accorded the state judicial process must give way to the primary role of the federal courts to redress constitutional deprivations."  *U.S. ex rel. Hankins v. Wicker*, 582 F. Supp. 180, 182 (W.D. Pa. 1984).

### B.  Circumstances Exist that Render State Processes Ineffective to Protect Petitioners' Rights

24.     Given the pressing threat posed by COVID-19, the rapid rate of transmissions, and the ever-growing number of cases among prison staff and inmates, Petitioners' rights can

---

[1] Petitioners' claims do not involve an attack on the proceedings that lead to their convictions, so their claims cannot be brought through a state post-conviction petition.  *See* 725 ILCS 5/122-1.

only be protected through immediate consideration of their claims.  To the extent that state corrective processes would exist for Petitioners under ordinary circumstances, current circumstances created by COVID-19 render those state processes ineffective to protect Petitioners' rights.  Given that most civil and criminal matters in Cook County will not be heard until at least May 18, 2020, the state process will be too delayed to result in meaningful relief for Petitioners.

25.     "Undue delay by a state court might show that available state remedies have been exhausted, permitting the federal court to proceed even while the state appeal was pending." *Jenkins v. Gramley*, 8 F.3d 505, 508 (7th Cir. 1993); *see also Hankins v. Fulcomer*, 941 F.2d 246, 250 (3d. Cir 1991).  To satisfy this exception to the exhaustion requirement, the delay must be inordinate, and must be attributable to the state.  Here, both conditions are met; there are inordinate delays in the state process, and those delays are attributable to the state.

26.     First, there are inordinate delays to the state process, as already described.  Although Petitioners recognize that the current delay in criminal and civil hearings is shorter than the months of delay that has established unjustifiable delay in other proceedings, *see e.g., Lowe v. Duckworth*, 663 F.2d 42, 43 (7th Cir. 1981); *Dozie v. Cady,* 430 F.2d 637 (7th Cir. 1970), the threat posed by COVID-19 makes *any* delay inordinate.

27.     Second, the delay is attributable to the state.  The Circuit Court of Cook County, where more than 17,000 class members' cases arise, has suspended the normal operations of the court; other county courts have also suspended normal operations and delayed proceedings individually through at least May 18, 2020.  Therefore, any  attempt to access the state court process would likely result in a delay of days or weeks, possibly months.

**V.   STATEMENT OF FACTS**

**A.   The COVID-19 Outbreak Has Created a National and Global Health Emergency**

28.     We are living in the midst of an extreme, unprecedented worldwide health emergency caused by the rapid spread of the coronavirus, COVID-19.  The World Health Organization has declared COVID-19 to be a global pandemic.[2]  On March 9, 2020, Illinois Governor J.B. Pritzker issued a proclamation declaring a disaster in the State of Illinois.[3]  On March 13, 2020, President Trump declared a national emergency.[4]

29.     The number of known COVID-19 infections is increasing daily.  As of April 1, 2020, there were more than 823,000 reported COVID-19 cases throughout the world and more than 40,500 people had died as a result of the virus.[5]  In the United States alone, there are over 186,000 confirmed cases and over 3,600 deaths.[6]  In Illinois, there are over 6,900 confirmed cases and 141 deaths.[7]  The number of COVID-19 cases in the United States is expected to grow exponentially.  The Centers for Disease Control and Prevention ("CDC") projects that without

---

[2] Rolling Updates on Coronavirus Disease (COVID-19), World Health Organization, https://www.who.int/emergencies/diseases/novel-COVID-19-2019/events-as-they-happen (last visited Mar. 29, 2020).

[3] Gubernatorial Disaster Proclamation, https://www2.illinois.gov/sites/gov/Documents/AP-PROVED%20-%20Coronavirus%20Disaster%20Proc%20WORD.pdf

[4] Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), available at https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/

[5] Coronavirus Disease 2019 (COVID-19) Situation Report – 72, World Health Organization (April 1, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200401-sitrep-72-covid-19.pdf?sfvrsn=3dd8971b_2

[6] Coronavirus Disease 2019 (COVID-19): Cases in U.S., Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fcases-in-us.html (last visited Apr. 1, 2020).

[7] Coronavirus Disease 2019 (COVID-19), Ill. Dept. of Pub. Health, http://www.dph.illinois.gov/topics-services/diseases-and-conditions/diseases-a-z-list/coronavirus (last visited April 1, 2020).

swift and effective public health interventions, over 200 million people in the U.S. could be in-fected with COVID-19 over the course of the epidemic, with as many as 1.7 million deaths.[8]

30.     COVID-19 is a particularly contagious disease.  A recent study showed that the virus can survive for up to three hours in the air, four hours on copper, up to twenty-four hours on cardboard, and up to two to three days on plastic and stainless steel.[9]  Indeed, a new study of an early cluster of COVID-19 cases in Wuhan, China revealed the dangers of indirect transmis-sion resulting from infected people contaminating common surfaces—in the study, it was a com-munal mall bathroom.[10]

31.     Controlling the spread of COVID-19 is made even more difficult because of the prominence of asymptomatic transmission—people who are contagious but who exhibit no symptoms, rendering ineffective any screening tools dependent on identifying disease symp-toms.[11]

32.     There is no known vaccine or cure for COVID-19.  No one is immune.

---

[8]  Sheri Fink, Worst-Case Estimates for U.S. Coronavirus Deaths, The New York Times, (Mar. 13, 2020), https://www.nytimes.com/2020/03/13/us/coronavirus-deaths-estimate.html

[9]  Novel Coronavirus Can live on Some Surfaces for Up to 3 Days, New Tests Show. TIME https://time.com/5801278/coronavirus-stays-on-surfaces-days-tests/ (last visited Mar. 31, 2020).

[10]  Jing Cai, et al., Indirect Virus Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020. Emerg Infect Dis. (2020), available at https://wwwnc.cdc.gov/eid/article/26/6/20-0412_ar-ticle.

[11]  Johnny Milano, Infected but Feeling Fine:  The Unwitting Coronavirus Spreaders, New York Times, https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmis-sion.html (last visited Apr. 1, 2020) .

33.     Common symptoms of COVID-19 include fever, cough, and shortness of breath.[12]  Other symptoms include congestion, sneezing, fatigue, or diarrhea.[13]  Many individuals who become infected with COVID-19 may have mild or moderate symptoms; some may experience no symptoms at all.  Other patients may experience severe symptoms requiring intensive medical intervention.[14]  However, even with hospitalization and intensive treatment, thousands of individuals have died as a result of this infection.  Regardless of the type of severity of symptoms, all infected persons are contagious and can rapidly transmit the virus from person to person without proper public health interventions.[15]  The virus is known to spread from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.[16]

34.     People over the age of fifty-five face greater chances of serious illness or death from COVID-19.  In a February 29, 2020 WHO-China Joint Mission Report, the preliminary mortality rate analyses showed that individuals age 70-79 had an overall 8% mortality rate, individuals age 60-69 had a 3.6% mortality rate, and individuals age 50-59 had a 1.3% mortality rate.

---

[12]  Coronavirus Disease 2019 (COVID-19), Symptoms of Coronavirus, CDC, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited Mar. 29, 2020).

[13]  Q&A on Coronaviruses (COVID-19), World Health Organization, https://www.who.int/news-room/q-a-detail/q-a-coronaviruses (last visited Mar. 29, 2020).

[14]  *Id.*

[15]  Coronavirus Disease 2019 (COVID-19): How It Spreads, CDC, https://www.cdc.gov/corona-virus/2019-ncov/prevent-getting-sick/how-covid-spreads.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Ftransmission.html (last visited Mar. 29, 2020).

[16]  *Id.*

For individuals age 40-49, the mortality rate was 0.4%, and for individuals 40 years and younger, the mortality rate was as low as 0.2%.[17]

35.     People of any age who suffer from certain underlying medical conditions are also at elevated risk, including people with respiratory conditions including chronic lung disease or moderate to severe asthma; people with heart disease or other heart conditions; people who are immunocompromised as a result of cancer, HIV/AIDS, or any other condition or related to treatment for a medical condition; people with chronic liver or kidney disease or renal failure (including hepatitis and dialysis patients); people with diabetes, epilepsy, hypertension, blood disorders (including sickle cell disease), inherited metabolic disorders; people who have had or are at risk of stroke; and people who are pregnant.[18]  The WHO-China Joint Mission Report indicates that the mortality rate for those with cardiovascular disease was 13.2%, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[19]

36.     For these vulnerable populations, the symptoms of COVID-19, particularly shortness of breath, can be severe, and complications can manifest at an alarming pace.  Most people in higher risk categories who develop serious illness will need advanced support.  This level of

---

[17]  Age, Sex, Existing Conditions of COVID-19 Cases and Deaths Chart, https://www.worldometers.info/coronavirus/coronavirus-age-sex-demographics/ (date analysis based on WHO-China Joint Mission Report).

[18]  Coronavirus Disease 2019 (COVID-19): People Who Need Extra Precautions, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fhigh-risk-complications.html (last visited Mar. 29, 2020).

[19]  Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World Health Organization (Feb. 28, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf

supportive care requires highly expensive and specialized equipment, including ventilators, that are in limited supply.[20]

37.     Increasingly, and in the United States in particular, even some younger and healthier people who contract COVID-19 may require hospitalization for supportive care, including intravenous fluids and supplemental oxygen.[21]  Medical providers and medical facilities are in peril of becoming completely overwhelmed and beyond capacity to provide this type of intensive care as COVID-19 continues to spread.[22]

38.     Even for those who survive COVID-19, recent clinical evidence indicates that in persons who suffer severe symptoms, the virus may also cause damage to organs such as the heart, the liver, and the kidneys, as well as to organ systems such as the blood and the immune system.  This damage is so extensive and severe that it may be enduring.  Among other things, patients who suffer severe symptoms from COVID-19 end up having damage to the walls and air sacs of their lungs, leaving debris in the lungs and causing the walls of lung capillaries to thicken so that they are less able to transfer oxygen going forward.  Indeed studies of some recovered patients in China and Hong Kong indicate a declined lung function of 20% to 30% after recovery.[23]

39.     The only way to prevent complications and the enormous risk to medically vulnerable people is to prevent them from becoming infected.  Everyone is at risk of transmission of

---

[20]  Greifinger Aff., Exhibit 1.
[21]  Meyer Decl., Exhibit 2.
[22]  *Id.*
[23]  Tianbing Wang, et al., Comorbidities and Multi-Organ Injuries in the Treatment of COVID-19, The Lancet, available at https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30558-4/fulltext (last visited Mar. 21, 2020); George Washington University Hospital, GW Hospital Uses Innovative VR Technology to Assess Its First COVID-19 Patient, available at https://www.gwhospital.com/resources/podcasts/covid19-vr-technology (last visited Apr. 1, 2020).

COVID-19. There is no available vaccine to protect against infection from COVID-19 and no medications approved to treat it.[24] The CDC and other public health agencies have universally prescribed social distancing—every person should remain at a distance of at least six feet from every other person—and rigorous hygiene—including regular and thorough hand washing with soap and water, the use of alcohol-based hand sanitizer, proper sneeze and cough etiquette, and frequent cleaning of all surfaces—as the only ways to meaningfully mitigate the spread of this virus.[25]

40.    The CDC has issued a guidance that gatherings of more than 10 people must not occur.[26] People in congregate environments, which are places where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19, as already evidenced by the rapid spread of the virus in cruise ships and nursing homes. The CDC also warns of "community spread" where the virus spreads easily and sustainably within a community where the source of the infection is unknown.[27]

---

[24] Coronavirus Disease 2019 (COVID-19): Situation Summary, CDC, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html (lasted visited Mar. 29, 2020).

[25] Coronavirus Disease 2019 (COVID-19): How to Protect Yourself, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Fprevention.html (last visited Mar. 29, 2020).

[26] Interim Guidance for Coronavirus Disease 2019 (COVID-19), Guidance as of 3/15/2020, https://www.cdc.gov/coronavirus/2019-ncov/community/large-events/mass-gatherings-ready-for-covid-19.html (last visited Apr. 1, 2020).

[27] Coronavirus Disease 2019 (COVID-19): How Coronavirus Spreads, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Apr. 1, 2020).

41.    On March 20, 2020, Illinois Governor Pritzker took the strictest measure yet to fight the virus's spread, issuing a "stay at home" executive order for all residents effective starting March 21, 2020 through at least April 7, 2020; which was then extended to April 30, 2020.[28] The order directs all non-essential business and operations to cease.  People are allowed to leave their homes only for essential activities.  Any gathering larger than 10 people is prohibited, and people are recommended to stay at least six feet away from others.  Restaurants, bars, schools, parks, and libraries have all been shut down.   In a statement to the public, Governor Pritzker explained that his order was based on his conversations with "some of the best medical experts, epidemiologists, mathematicians, and modelers," and all recommended a stay at home order "to avoid the loss of potentially tens of thousands of lives."[29]

42.    Governors around the country, including in California, New York, and Connecticut, have issued similar stay at home orders to curb the spread of the virus.[30]

43.    Recognizing the imperative of social distancing, Circuit Court Chief Judge Timothy Evans ordered that the Cook County courts be largely closed to the public, that all hearings be conducted via videoconference wherever possible, and that all individuals in the courthouses maintain a minimum distance of six feet from all other individuals.[31]  This Court, joined by other

---

[28]  Executive Order In Response to COVID-19 (COVID-19 Executive Order No.8), https://www2.illinois.gov/IISNews/21288-Gov._Pritzker_Stay_at_Home_Order.pdf; Illinois' Stay-at-Home Order Extended Through April, Pritzker Announces, NBCChicago (Mar. 31, 2020) https://www.nbcchicago.com/news/local/illinois-stay-at-home-order-expected-to-be-extended-sources/2247274/

[29]  Gov. J.B. Pritzker issues order requiring residents to 'stay at home' starting Saturday, Chicago Tribune, Mar. 20, 2020, https://www.chicagotribune.com/coronavirus/ct-coronavirus-illinois-shelter-in-place-lockdown-order-20200320-teedakbfw5gvdgmnaxlel54hau-story.html

[30]  Id.

[31]  Circuit Court of Cook County, Administrative Order 2020-01 (amended Mar. 30, 2020), available at http://www.cookcountycourt.org/Portals/0/Order%203-30-20.pdf

district courts in the state and across the country, have continued all criminal and civil jury trials because the imperative of social distancing "render[s] juror participation difficult or unsafe."[32]

### B. Incarcerated People Are Particularly Vulnerable to Infection from COVID-19

44. None of the recommended measures for mitigating the spread of COVID-19 are available for persons confined in correctional facilities and for those who must interact with them. Correctional facilities are inherently congregate environments, where large groups of people live, eat, and sleep in close contact with one another. It is impossible to achieve social distancing standards in these settings.[33] Therefore infectious diseases, particularly airborne diseases, such as COVID-19, are more likely to spread rapidly between individuals in correctional facilities.[34]

45. The risk of contracting an infectious disease is also higher in correctional facilities because the facilities are not sanitary environments. People share toilets, sinks, and showers, and often have limited access to soap, hand sanitizer, hot water, and other necessary hygiene items. Surfaces are infrequently washed, if at all, and cleaning supplies are in short supply.[35] These needs are now multiplied and also compounded by the lack of personal protective equipment (PPE) such as masks and gloves for either staff or prisoners. This means there are more

---

[32] U.S. District Court for the Northern District of Illinois, 2d Am. Gen. Order 20-0012 (Mar. 30, 2020); *see also* U.S. District Court for the Southern District of Illinois, Admin. Order 263 (Mar. 30, 2020); U.S. District Court for the Central District of Illinois, Am. Gen. Order 20-01 (Mar. 18, 2020).

[33] Greifinger Aff., Exhibit 1; Haney Decl., Exhibit 3.

[34] Beyrer Aff., Exhibit 4; Meyer Decl., Exhibit 2.

[35] Greifinger Aff., Exhibit 1; Meyer Decl., Exhibit 2; Beyrer Decl., Exhibit 4; Haney Decl., Exhibit 3.

people who are susceptible to getting infected all congregated together in a context in which fighting the spread of an infection is nearly impossible.

46.     Given the history of epidemiologic outbreaks in correctional facilities, such as tuberculosis, influenza, and MRSA, it is expected that COVID-19 will also readily spread in prisons, especially when people cannot engage in proper hygiene and adequately distance themselves from infected residents or staff. [36]

47.     The people who live in these environments—environments that defy all current public safety standards— are themselves at high risk due to the high rates of chronic health conditions, substance use, mental health issues. They are part of the aging and chronically ill populations who may be vulnerable to more severe illnesses, and to death, after infection from COVID-19.[37] As Dr. Craig Haney, a correctional health expert, explains, prisoners are "unusually vulnerable to stress-related and communicable diseases.  Formerly incarcerated persons suffer higher rates of certain kinds of psychiatric and medical problems.  Incarceration leads to higher rates of morbidity (illness rates) and mortality (i.e., it lowers the age at which people die)."[38]

48.     Additionally, many correctional facilities lack an adequate medical care infrastructure to address the spread of infectious disease, like COVID-19, and treat high-risk people in custody.[39]  Prison health units are not equipped with sufficient emergency medical equipment, such as oxygen tanks, nasal cannulae, and oxygen face masks, to respond to an outbreak of patients with respiratory distress.  For these reasons, among others, experts have warned that, "widespread community transmission of COVID-19 within a correctional institution is likely to

---

[36] Beyrer Decl., Exhibit 4.
[37] *Id.*
[38] Haney Aff., Exhibit 3.
[39] Greifinger Aff., Exhibit 1; Meyer Decl., Exhibit 2.

result in a disproportionately high COVID-19 mortality rate."[40]  Prisons and jails rely on outside community hospitals to provide more advanced and intensive medical care, and during an epidemic, this will not be possible, as those outside facilities will likely be at or over capacity themselves.[41]

49.     Prisons are not closed environments.  By necessity, members of the free community, including correctional officers, social workers, attorneys, medical personnel, and many others must enter and leave the prisons on a daily basis.  Staff arrive and leave each facility three times a day in large numbers, and there is little to no ability to adequately screen staff for new, asymptomatic infection.  When the COVID-19 virus occurs and spreads within a prison, all persons, staff and prisoners alike, are at heightened risk of contracting the virus and, in turn, spreading the virus to others with whom they come in contact in their own homes and neighborhoods.[42]

50.     At the Governor's March 29, 2020, daily briefing on the coronavirus situation, IDPH Director Dr. Ngozi Ezike acknowledged the present danger that when the infection enters prisons, the congregate nature of these facilities, with staff coming and going from the community each day in large numbers, will "increase the rate of infection and its fast spread through these facilities."[43]

---

[40] "COVID-19 in Correctional Settings: Unique Challenges and Proposed Responses" (March 23, 2020), https://amend.us/wp-content/uploads/2020/03/COVID-in-Corrections-Challenges-and-Solutions-1.pdf;
*see also* "Correctional Facilities In The Shadow Of COVID-19: Unique Challenges And Proposed Solutions," Health Affairs Blog, March 26, 2020,  available at: https://www.healthaffairs.org/do/10.1377/hblog20200324.784502/full/
[41]  Meyer Decl., Exhibit 2.
[42]  Greifinger Aff., Exhibit 1.
[43]  The Governor's Press Conferences are available for streaming at: https://www.nbcchicago.com/news/local/watch-live-daily-coronavirus-briefing-from-illinois-health-officials/2234359/ (last visited March 31, 2020).

51.     On March 30, 2020, following the death of a COVID-19 patient at Stateville, Dr. Ezike again acknowledged the heightened risk posed by correctional settings and the inability to conform them to public health standards:

> Congregate settings such as Stateville, any other correctional center, pose unique challenges in stopping the spread of disease and protecting the health of individuals who live and work there. Those who are incarcerated obviously live and work and eat and study and recreate all within that same environment, heightening the potential for COVID-19 to spread really quickly once it's introduced.
>
> The options for isolation of COVID-19 cases are limited in this focused setting and it becomes very difficult depending on the size of the facility and the population that's already in the facility. Ideally, all cases should be isolated individually and close contact should be quarantined individually. I know our partners at the Department of Corrections are working innovatively to try to create the best situations for these, for these facilities. But some facilities and correctional centers do not have enough individual cells, and so we are considering isolating multiple laboratory confirmed COVID-19 cases together as a group, or quarantining close contacts of a particular case together as a group.[44]

52.     The devastating impact that a COVID-19 outbreak in IDOC will have on surrounding communities is already a reality. Stateville Correctional Center announced its first confirmed case on Wednesday, March 25, 2020, and by Monday evening, March 30, 2020, St. Joseph Hospital in Joliet was "overwhelmed" by inmates suffering from the effects of coronavirus and staff were "maxed out."[45] The hospital's medical director, Dr. John Walsh, said, "This is a disaster because what I most fear is that without some resolution, the number of cases coming in from Stateville will become excessive. We currently have nine inmates on ventilators, critically ill. There was four in the emergency department a couple of hours ago, and I believe the volume of patients there is huge. In addition, something has to be done at Stateville. You will have a

---

[44] Available at: https://www.nbcchicago.com/news/local/watch-live-daily-coronavirus-briefing-from-illinois-health-officials/2234359/ (last visited March 31, 2020).

[45] abc7 Chicago, Illinois Prisoners Sick with COVID-19 Overwhelm Juliet Hospital (video), available at https://abc7chicago.com/health/illinois-prisoners-sick-with-covid-19-overwhelm-joliet-hospital/6064085/ (last visited Mar. 31, 2020).

huge epidemic, remembering that 20% of the people who contract this virus are probably gonna end up in hospital and a number of them are gonna die. This could end with up to 100 inmates dying if this is out of control, and they are not isolated well at this point."[46] St. Joseph Hospital is now caring for 17 prisoners from Stateville, 9 of whom are in intensive care on ventilators. Other prison communities throughout Illinois are similarly situated, many with far fewer intensive care beds available to provide care when an outbreak occurs. To prevent the crisis now occurring in Joliet from repeating and worsening across the state, effective mitigation measures must be taken now.

### C. Reducing the Prison Population Is the Only Meaningfully Means to Prevent the Harm Caused by COVID-19 in Prisons and their Surrounding Communities

53.     Because the public health and safety measures cannot be fully achieved in correctional facilities, other steps must be taken to save lives and protect the spread of the infection from these communities. Proactive risk mitigation, including eliminating close contact in congregate environments, is the only effective way to prevent the spread of the COVID-19 infection. In fact, a study published in the Journal of Travel Medicine found that the number of COVID-19 cases on the Diamond Princess cruise ship would have been more than eight times lower if the ship had been evacuated in a timely manner, rather than requiring the passengers to quarantine within the close confines of the ship.[47]

---

[46] *Id.*
[47] Sandoiu, supra (Citing Rocklov J., Sjodin H., Wilder-Smith A., COVID-19 Outbreak on the Diamond Princess Cruise Ship: Estimating the Epidemic Potential and Effectiveness of Public Health Countermeasures. Journal of Travel Medicine (Feb. 28, 2020), https://academic.oup.com/jtm/advance-article/doi/10.1093/jtm/taaa030/5766334

54.     Public health experts with experience in correctional settings have similarly rec-ommended the release from custody of people most vulnerable to COVID-19 to protect the com-munities inside and outside the prisons, and to slow the spread of the COVID-19 infection.  Pop-ulation reduction protects the people with the greatest vulnerability to COVID-19 from transmis-sion of the virus, and also allows for greater risk mitigation for all people held or working in a correctional facility.  Because prisons are often located in small rural communities, removing the most vulnerable people from custody also reduces the burden on those region's limited health care infrastructure by reducing the likelihood that an overwhelming number of people will be-come seriously ill from COVID-19 at the same time and require hospitalization in these small communities.

55.     Dr. Robert Greifinger, a correctional health expert, has concluded that "[r]isk mitigation is the only viable public health strategy available to limit transmission of infection, morbidity and mortality in prisons, and to decrease the likely public health impact outside of the prisons.  Even with the best-laid plans to address the spread of COVID-19 in prisons, the release of individuals, prioritizing the most medically vulnerable individuals, is a key part of a risk miti-gation strategy . . . Additionally, the release of detainees who present a low risk of harm to the community is also an important mitigation strategy as it reduces the total number of detainees in a facility."

56.     Dr. Greifinger explains that reducing the prison population "has a number of val-uable effects on public health and public safety: it allows for greater social distancing, which re-duces the chance of spread if virus is introduced; it allows easier provision of preventive measures such as soap for hand washing, disinfecting supplies for surfaces, frequent laundering

and showers, etc.; and it helps prevent overloading the work of detention staff, which will likely be reduced by illness, such that they can continue to ensure the safety of detainees."

57.     Similarly, Dr. Craig W. Haney, a Distinguished Professor of Psychology and UC Presidential Chair at the University of California Santa Cruz, recommends that "adult prisons must reduce their populations urgently in order to allow the necessary social distancing in response to the COVID-19 Pandemic."[48]

58.     Professor Chris Breyer, professor of Epidemiology at John Hopkins Bloomberg School of Public Health, has concluded: "While every effort should be made to reduce exposure in detention facilities, this may be extremely difficult to achieve and sustain.  It is therefore an urgent priority in this time of national public health emergency to reduce the number of persons in detention as quickly as possible."[49]

59.     Dr. Jaimie Meyer, Assistant Professor of Medicine at Yale School of Medicine and Assistant Clinical Professor of Nursing at Yale School of Nursing, has concluded that "[r]educing the size of the population in jails and prisons can be crucially important to reducing the level of risk both for those within those facilities and for the community at large."[50]  She explains that "[h]ealth in jails and prisons is community health.  Protecting the health of individuals who are detailed in and work in these facilities is vital to protecting the health of the wider community."[51]

---

[48]  Haney Decl., Exhibit 3.
[49]  Beyrer Decl., Exhibit 4.
[50] Meyer Decl., Exhibit 2.
[51]  *Id.*

60.     Dan Pacholke, a corrections expert with more than 37 years of experience, has specific recommendations for steps IDOC can take to proactively respond to COVID-19 to protect the health and safety of people in IDOC custody and IDOC staff.[52]  Mr. Pacholke explains: "Among those steps is considering how IDOC can exercise its authority and discretion . . . to reduce the prison population.  This includes awarding good time credits, transferring people to home detention, and authorizing medical furloughs."[53]  Mr. Pacholke further explains that "[a]ll of these and any other options should be fully utilized to allow individuals to maintain social distancing and have better access to testing and treatment.  This will also help mitigate the impact of staff shortages and lessens the burden on prison medical services."[54]

61.     Internationally, governments have recognized the threat posed by COVID-19 in correctional facilities and have released detainees.  In Iran, for example, about 70,00 people were temporarily released from jails to curb the spread of COVID-19.[55]

62.     In the United States, the need to address the COVID-19 problem in prisons has been recognized on a national level.  The COVID-19 stimulus package passed by Congress specifically includes funding for federal prisons to purchase personal protective gear and tests kits for COVID-19 because of the "density of the inmate population, the high traffic, the high volume of inmates, [and] the high rate of turnover of inmates and personnel."[56]  The bill authorizes the

---

[52] Pacholke Decl., Exhibit 5.
[53] *Id.*
[54] *Id.*
[55] Iran Temporarily Releases 70,000 Prisoners As Coronavirus Cases Surge, Reuters (Mar. 9, 2020), https://www.reuters.com/article/us-health-coronavirus-iran/iran-temporarily-releases-70000-prisoners-ascoronavirus-cases-surge-idUSKBN20W1E5
[56] Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") H.R. 748, at 633 (2020), available at https://assets.documentcloud.org/documents/6819239/FINAL-FINAL-CARES-ACT.pdf

Attorney General to lengthen the maximum amount of time that a federal prisoner can be placed in home confinement during the pandemic.[57]

63.     On March 30, 2020, the United States House of Representatives Committee on the Judiciary recommended a similar plan of action, calling on the federal Bureau of Prisons to drastically increase its population reduction efforts, including through release where viable and increased use of home detention.[58]

64.     Echoing the calls of advocates and medical professionals, a group of 35 elected prosecutors have called on leaders within the criminal legal system to "dramatically reduce the number of incarcerated individuals and the threat of disastrous outbreaks."[59]

65.     A number of states have begun to take steps to protect people in prisons from the impending spread of COVID-19 by releasing people in an effort to reduce populations.

66.     In California, Governor Newsom announced his plans to accelerate the release of 3,500 people from state prisons in an effort to reduce the population as COVID-19 infections continue to spread in the prisons.[60]  This announcement comes in advance of a court hearing schedule to begin later this week to determine if more individuals should be released.

---

[57] *Id.* at 634.

[58] March 30, 2020 letter, https://judiciary.house.gov/uploadedfiles/3.30.20_letter_to_ag_barr_re_covid19.pdf?utm_source=The+Marshall+Project+Newsletter&utm_campaign=e6df8704ef-EMAIL_CAMPAIGN_2020_03_31_11_34&utm_medium=email&utm_term=0_5e02cdad9d-e6df8704ef-174272961

[59] Fair and Just Prosecution, Joint Statement from Elected Prosecutors on COVID19 and Addressing the Rights and Needs of Those in Custody (Mar. 2020), https://fairandjustprosecution.org/wp-content/uploads/2020/03/Coronavirus-Sign-On-Letter.pdf

[60] Paige St. John, *California to release 3,500 inmates early as coronavirus spreads inside prisons*, LATimes (Mar. 31, 2020), https://www.latimes.com/california/story/2020-03-31/coronavirus-california-release-3500-inmates-prisons.

67.     The Iowa Department of Corrections has announced that the DOC is expediting the release of about 700 prisoners, or 7% of its population, who are approved for parole or work release.[61]

68.     In New York, Governor Cuomo ordered the release of more than 1,000 people who are in prisons and jails across the state on the basis of a parole violation.[62]

69.     In Colorado, Governor Polis issued an executive order that suspended the caps and criteria Colorado places on the accrual of good time credits in order to allow the DOC to award earned time credits to "facilitate the reduction of the population of incarcerated persons and parolees to prevent an outbreak in prisons."[63]  Additionally, the Colorado governor suspended and relaxed the criteria for individuals to be released to Special Needs Parole.[64]

70.     The Vermont Department of Corrections has worked to reduce its population: "[t]he goal is to reduce our (inmate) population so we can start spreading out the remaining population."[65]  Jim Baker, commissioner for the Department, stated that they "started by looking at

---

[61] *Officials cut prison, jail numbers; Iowa virus cases hit 105,* Newton Daily News (Mar. 24, 2020) https://www.newtondailynews.com/2020/03/23/officials-cut-prison-jail-numbers-iowa-virus-cases-hit-105/acs5xbk/.  Also, in North Dakota, the state parole board decided to release over fifty people, or about 2% of its prison population, on early parole.  *See* April Baumgarten, *North Dakota paroles 56 prisoners early amid pandemic, including 3 convicted of sexual assault,* Grand Forks Herald (Mar. 20, 2020), https://www.grandforksherald.com/news/crime-and-courts/5009882-North-Dakota-paroles-56-prisoners-early-amid-pandemic-including-3-convicted-of-sexual-assault

[62] Brendan J. Lyons, *NY to release 1,100 parole violators as coronavirus spreads,* Times Union (Mar. 27, 2020), https://www.timesunion.com/news/article/Deaths-surge-again-in-New-York-from-coronavirus-15160973.php (reporting on New York Governor Cuomo's order to release parole violators).

[63] State of Colorado, Executive Order D 2020 016, March 25, 2020, at pg. 2, available at: https://drive.google.com/file/d/18o0yWHzZleHJ87hmgLuBmXwpM8R74Q5x/view

[64] *Id.*

[65] Anna Merriman, *'It's very difficult to control': Many Vermont inmates released so that those who remain can be spread out,* Valley News (Mar. 26, 2020). https://www.vnews.com/Vermont-NH-prisons-working-to-reduce-population-to-prevent-virus-spread-33512589

which inmates can be let out on furlough and who can be released on probation."[66]  Since late February, the Vermont DOC has released over 200 prisoners (from a population of approximately 1600), with 100 prisoners being released in the past week.[67]

71.     Other states, like Oklahoma and Wisconsin, have taken more moderate, and thus less effective, steps to reduce the populations in prisons by only halting new admissions from county jails into state prison facilities.[68]

72.     Several counties with significant jail populations have also undertaken measures to reduce their facility's population in an effort to slow the spread of COVID-19.  Many of these steps have included drastically reducing the jail populations within a matter of weeks, or sometimes days.  Counties on the West Coast have been the sites of several large scale jail population reductions.  Counties in California in particular have seen significant reductions.  The Los Angeles County Sheriff decreased the jail population by ten percent by releasing 1,700 individuals within the last month.[69]  In Alameda County in Northern California, more than 300 individuals have been released from jail in the span of two weeks, amounting to eleven percent of the jail's

---

[66]  *Id.*

[67]  *Id.*; For population size, *see* https://doc.vermont.gov/sites/correct/files/documents/2020-03-23-DOC%20Staff%20Test.pdf

[68]  *DOC Stops Accepting Newly Sentenced State Prisoners*, The Frontier (Mar. 22, 2020), https://www.enidnews.com/news/local_news/doc-stops-accepting-newly-sentenced-state-prisoners/article_ea6a42a4-47c1-5dbc-9446-5dec46032c5d.html (Oklahoma DOC halting new admissions into the state prison system); Emergency Order # 9, Order to the Dep't of Corrections, Tony Evers, Gov. Wisconsin (Mar. 20, 2020).

[69]  Justin Carissimo, 1,700 inmates released from Los Angeles County in response to coronavirus outbreak, CBS News (Mar. 24, 2020), https://www.cbsnews.com/news/inmates-released-los-angeles-county-coronavirus-response-2020-03-24/

population.[70]  Oregon has similarly reduced its jail population in Washington County, outside

Portland, by more than 120 inmates (from a population of 574), freeing up enough space for each

remaining inmate to be housed in their own cell.[71]  Washington State similarly released more

than 400 individuals from county jails in Clark and King County over the course of a couple of

days.[72]  In Arizona,  Coconino County released ten percent of the jail population to reduce the

population to 400,[73] and the Pima County Sheriff has proposed releasing seven percent of the jail

population by releasing 135 inmates.[74]  In Utah, about 200 individuals are in the process of being

released from the Salt Lake County jail over the coming days (a 10% reduction in population),

following the release of about 90 women from county jail.[75]

---

[70]  *Sheriff Releases 314 Inmates to Reduce Coronavirus Risk at Alameda County Jail*, NBC Bay Area, (Mar. 19, 2020), https://www.nbcbayarea.com/news/coronavirus/sheriff-releases-314-in-mates-to-reduce-coronavirus-risk-at-alameda-county-jail/2258026/ ("The release of the 314 inmates reduces the number of inmates at Santa Rita to 2,40.").

[71]  Kimberly Kindy, Emma Brown & Dalton Bennett, *'Disaster waiting to happen': Thousands of inmates released as jails and prisons face coronavirus threat,* Washington Post (Mar. 25, 2020), https://www.washingtonpost.com/national/disaster-waiting-to-happen-thousands-of-in-mates-released-as-jails-face-coronavirus-threat/2020/03/24/761c2d84-6b8c-11ea-b313-df458622c2cc_story.html (Washington County jail reduced its population by 120 individuals); Bob Heye, *Coronavirus and Crime: Jail releases, a rash of break-ins and one encouraging trend,* KATU (Mar. 23, 2020), https://katu.com/news/coronavirus/coronavirus-and-crime-jail-releases-a-rash-of-break-ins-and-one-encouraging-trend

[72]  Jerzy Shedlock, *Clark County Jail releases nearly 200 inmates due to COVID-19*, The Co-lumbian (Mar. 25, 2020), https://www.columbian.com/news/2020/mar/25/clark-county-jail-re-leases-nearly-200-inmates-due-to-covid-19/

[73]  Scott Buffon, *Coconino County jail releases nonviolent inmates in light of coronavirus con-cerns,* Arizona Daily Sun (Mar. 20, 2020), https://azdailysun.com/news/local/coconino-county-jail-releases-nonviolent-inmates-in-light-of-coronavirus-concerns/article_a6046904-18ff-532a-9dba-54a58862c50b.html.

[74]  Jacques Billeaud, *Tucson lawyers seek release of nonviolent inmates from jail,* Tucson.com (Mar. 24, 2020), https://tucson.com/news/local/crime-and-courts/tucson-lawyers-seek-release-of-nonviolent-inmates-from-jail/article_0cd49be4-6dd6-11ea-99d3-576d60e1dae5.html.

[75]  Francisco Kjolseth, *Hundreds of Utah inmates will soon be released in response to corona-virus*, The Salt Lake Tribune (Mar. 20, 2020), https://www.sltrib.com/news/2020/03/21/hun-dreds-utah-inmates/ (the total jail population in Salt Lake County jail was 1,964 people).

73.    Cleveland, Ohio drastically reduced the Cuyahoga County jail's population by releasing over 700 people from detention, a 35 percent reduction in population.[76]  In Minnesota, the Hennepin County jail released 26 percent of the individuals detained.[77]  In New Orleans, judges overseeing the local criminal court issued a "blanket order" to release a substantial number of individuals being held in pretrial detention.[78]  The New Orleans jail population has subsequently been reduced by about 14 percent.[79]  In Alabama, the jail population in Washington County is likely to reduce by over 40 percent: from more than 800 a few months ago to below 450.[80]  Several other Midwestern and Southern counties have seen population reductions of 150

---

[76]  Officials taking steps to reduce county jail populations in Ohio, AP, WBNS (Mar. 21, 2020), https://www.10tv.com/article/officials-taking-steps-reduce-county-jail-populations-ohio-2020-mar

[77]  *Coronavirus In Minnesota: Hennepin County Jail Population Cut By 26% After Release Of Low-Risk Inmates To Prevent COVID-19 Spread*, CBS Minnesota (Mar. 23, 2020), https://minnesota.cbslocal.com/2020/03/23/coronavirus-in-minnesota-hennepin-county-jail-population-cut-by-26-after-release-of-low-risk-inmates-to-prevent-covid-19/

[78]  Orleans Criminal Court judges order release of certain inmates amid coronavirus crisis, WDSU News, (Mar. 26, 2020), https://www.wdsu.com/article/orleans-criminal-court-judges-order-release-of-certain-inmates-amid-coronavirus-crisis/31943462#

[79]  *Id.*

[80]  Tom Sissom, Washington County jail plans for release of 81 more inmates, Northwest Arkansas Democrat-Gazette (Mar. 26, 2020), https://www.nwaonline.com/news/2020/mar/26/washington-county-jail-plans-release-81-more-inmat/

or more individuals from relatively small county jails, including: Oklahoma County, Oklahoma;[81] Sedgwick County, Kansas;[82] Bexar County, Texas;[83] St. Louis County, Missouri;[84] Macomb and Wayne Counties in Michigan;[85] Kenton and Louisville Counties in Kentucky;[86] and Nashville, Tennessee.[87]

---

[81] Oklahoma County, (Kayla Branch, *Coronavirus in Oklahoma: Over 200 nonviolent offenders released from Oklahoma County jail to limit COVID-19 spread,* The Oklahoman (Mar. 25, 2020) https://oklahoman.com/article/5658504/coronavirus-in-oklahoma-over-200-non-violent-offenders-released-from-oklahoma-county-jail-to-limit-covid-19-spread (releasing 200 people).

[82] R. Leiker & Michael Stavola, *So far, 200 jail inmates released over COVID-19 concerns, Sedgwick County DA says,* The Wichita Eagle (Mar. 26, 2020), https://www.kansas.com/news/local/crime/article241501106.html

[83] Eileen Pace, *Bexar County Jail Explores Early Releases, Ceasing Low-Level Arrests Amid Coronavirus*, Texas Public Radio (Mar. 20, 2020), https://www.tpr.org/post/bexar-county-jail-explores-early-releases-ceasing-low-level-arrests-amid-coronavirus (releasing more than 140 people).

[84] Jeremy Kohler & Joel Currier, *St. Louis city and county to release more than 140 inmates amid virus concerns*, St. Louis Post-Dispatch (Mar. 26, 2020) https://www.stltoday.com/news/local/crime-and-courts/st-louis-city-and-county-to-release-more-than-inmates/article_dd8b30f6-c3ea-5229-b7ac-0aa36ee8f14c.html.

[85] Karen Drew, *Metro Detroit county jails reviewing cases to see which inmates could be released amid coronavirus (COVID-19) outbreak*, Click On Detroit (Mar. 24, 2020), https://www.clickondetroit.com/news/defenders/2020/03/25/metro-detroit-county-jails-reviewing-cases-to-see-which-inmates-could-be-released-amid-coronavirus-covid-19-outbreak/ (the two counties combined released more than 440 individuals).

[86] John Cheves, *Chief justice pleads for Kentucky inmate releases ahead of COVID-19, but progress slow*, Lexington Herald Leader (Mar. 23, 2020), https://www.kentucky.com/news/coronavirus/article241428266.html; Katrina Helmer, M*etro Corrections releasing non-violent inmates to prevent coronavirus spread*, WDRB.com (Mar. 18, 2020), https://www.wdrb.com/news/metro-corrections-releasing-non-violent-inmates-to-prevent-coronavirus-spread/article_0fbed080-6968-11ea-ada1-f73b721440b2.html

[87] Kevin Johnson, *Local jails releasing hundreds of prisoners amid coronavirus fears, up from dozens just weeks ago,* USAToday (Mar. 26, 2020), https://www.usatoday.com/story/news/politics/2020/03/26/jails-free-hundreds-prisoners-stop-coronavirus/5077204002/

74.     On the East Coast, Pittsburgh reduced the county jail population by 20 percent by releasing approximately 500 people.[88]  New York City plans to release about 7% of Rikers Island's population by releasing 375 inmates who do not pose a threat to society, amidst a call from advocates for more releases given the ballooning rate of infection in Rikers Island.[89]  A Florida county, which includes Tampa, also reduced its local jail population of 2,700 by releasing 6 percent, or 164 people, from the jail.[90]

75.     Supreme courts in several states have collaborated in or led the efforts to reduce jail populations by issuing orders, demonstrating a growing consensus on the huge impact that the virus has within detention facilities.  The Chief Justice of New Jersey ordered the release of approximately 1,000 individuals from New Jersey jails, which is nine percent of the population.[91]  South Carolina's Chief Justice ordered the release of all individuals charged with a non-capital offense on their own recognizance, unless the individual presents an unreasonable danger

---

[88]  Paula Reed Ward, *485 Allegheny County jail inmates released over virus fears*, Pittsburgh Post-Gazette (Mar. 26, 2020), https://www.post-gazette.com/news/crime-courts/2020/03/26/Allegheny-County-jail-inmates-485-released-Pittsburgh-coronavirus-COVID-19-fears/stories/202003260184.

[89]  Tess Owen, *NYC Is Releasing Hundreds of Inmates to Stop the Spread of Coronavirus*, VICE News (Mar. 26,2020), https://www.vice.com/en_us/article/939j9a/nyc-is-releasing-hundreds-of-inmates-to-stop-the-spread-of-cornavirus; Noah Higgins-Dunn, Coronavirus: New York City to release 300 nonviolence inmates from Rikers Island,  CNBC (Mar. 24, 2020) https://www.cnbc.com/2020/03/24/coronavirus-new-york-city-to-release-300-nonviolent-inmates-from-rikers-island.html

[90]  Thomas Metevia, , *Hillsborough County to free non-violent inmates in effort to prevent COVID-19 spread, ,* Click Orlando.com (Mar. 20, 2020), https://www.clickorlando.com/news/local/2020/03/19/hillsborough-county-to-free-non-violent-inmates-in-effort-to-prevent-covid-19-spread/.

[91]  In re Request to Commute or Suspend County Jail Sentences, Dkt. No. 084230 (N.J. Mar. 22, 2020) (ordering the release of any inmate in New Jersey serving a county jail sentence as a condition of probation or as a result of a municipal court conviction); *see* Tracey Tully, *1,000 Inmates Will Be Released From N.J. Jails to Curb Coronavirus Risk,* NYTimes (Mar. 23, 2020), https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-release.html.

to the community or is an extreme flight risk.[92]  Nearly 200 people were released pursuant to this order.[93]  In Montana, the Chief Justice instructed his state's judges to "review your jail rosters and release, without bond, as many prisoners as you are able, especially those being held for non-violent offenses."[94]  In California, the Chief Justice instructed courts at sentencing or when setting conditions of release to consider the person's "existing health conditions" and any "conditions existing at . . . the anticipated place of confinement that could affect the [person's] health."[95]

76.    Recognizing the immediate threat of COVID-19 and the need to reduce the population of Cook County Jail to limit the risk of jail detainees and staff being exposed to COVID-19 and allow for people in the jail to practice social distancing, on March 23, 2020, Judge LeRoy Martin in the Circuit Court of Cook County issued an order for an expedited bond process for specific classes of defendants, including those charged with low-level felonies, those detained on a cash bond they cannot afford, medically-vulnerable detainees, those serving a jail sentence, and those locked up on a probation or parole violation warrant.[96]

---

[92]  Memorandum from Donald W. Beatty, Chief Justice of South Carolina Supreme Court, to Magistrates, Municipal Judges, and Summary Court Staff (Mar. 16, 2020), https://www.sccourts.org/whatsnew/displayWhatsNew.cfm?indexId=2461
[93]  Kyle C. Barry, *Some Supreme Courts Are Helping Shrink Jails To Stop Outbreaks. Others Are Lagging Behind*, The Appeal (Mar. 25, 2020), https://theappeal.org/politicalreport/some-supreme-courts-are-helping-shrink-jails-coronavirus/
[94]  Letter from Mike McGrath, Chief Justice of Montana Supreme Court, to Montana Courts of Limited Jurisdiction Judges (Mar. 20, 2020), https://courts.mt.gov/Portals/189/virus/Ltr%20to%20COLJ%20Judges%20re%20COVID-19%20032020.pdf?ver=2020-03-20-115517-333.
[95]  Kyle C. Barry, *Some Supreme Courts Are Helping Shrink Jails To Stop Outbreaks. Others Are Lagging Behind*, The Appeal (Mar. 25, 2020), https://theappeal.org/politicalreport/some-supreme-courts-are-helping-shrink-jails-coronavirus/
[96]  Matt Masterson, COVID-19 Case at Cook County Jail Prompts More Calls for Mass Detainee Release, WTTW News (Mar. 23, 2020), https://news.wttw.com/2020/03/23/covid-19-case-cook-county-jail-prompts-more-calls-mass-detainee-release

**D. IDOC and Governor Pritzker Are Failing to Take Necessary Precautions to Reduce the Spread of COVID-19 Within Prisons and Their Surrounding Communities, Placing People at an Increased Risk**

77.     The IDOC operates 28 adult correctional facilities throughout the State of Illinois and houses around 37,000 individuals.  There are 11,600 individuals employed by the IDOC.

78.     Illinois prisons are on the cusp of an outbreak, but there is still time for urgent and decisive action that can prevent harm.  The first confirmed cases of COVID-19 in IDOC occurred on Wednesday, March 25, 2020—three prisoners and three staff tested positive for COVID-19, and 10 additional prisoners were tested and were awaiting results.

79.     As of April 1, 2020, there are 52 confirmed prisoners who have COVID-19 in two different correctional centers (Stateville and North Lawndale ATC) and 25 confirmed staff who have the virus in seven different correctional centers (Stateville NRC, Stateville, Sheridan, North Lawndale ATC, Menard, Joliet Treatment Center, and Crossroads ATC).[97]  There are 187 additional prisoners who were tested and are awaiting results.[98]  However, the actual number of individuals with COVID-19 in IDOC is likely much higher.

80.     On March 30, 2020, health officials announced that a prisoner in his 50s housed at Stateville Correctional Center had died from COVID-19.[99]

81.      On March 26, 2020, the Governor acknowledged that "certain populations are at a higher risk of experiencing more severe illness as a result of COVID-19, including older adults

---

[97]  COVID-19 Response, Illinois Department of Correction, https://www2.illinois.gov/idoc/facilities/Pages/Covid19Response.aspx (last visited April 1, 2020).
[98]  *Id.*
[99]  Emily Hoerner, Elderly inmates are at high risk for coronavirus. Why are there so many of them in Illinois's prisons?, InjusticeWatch, https://www.injusticewatch.org/news/2020/elderly-inmates-are-at-high-risk-for-coronavirus-why-are-there-so-many-of-them-in-illinoiss-prisons/

and people who have serious chronic health conditions, such as heart disease, diabetes, lung disease or other mental or physical conditions."[100]  The Governor also acknowledged that "the vast majority" of those housed within IDOC are in "close proximity and contact with each other in housing units and dining halls," making them "especially vulnerable to contracting and spreading COVID-19."[101]  The Governor further acknowledged that "the IDOC currently has limited housing capacity to isolate and quarantine inmates who present as symptomatic of, or test positive for, COVID-19."[102]  The Governor stated that "to ensure that the Director of the IDOC may take all necessary steps, consistent with public health guidance, to prevent the spread of COVID-19 in the IDOC facilities and provide necessary healthcare to those impacted by COVID-19, it is critical to limit any increases in the number of inmates in the IDOC facilities."[103]  In response, the Governor issued an emergency executive order that suspended admissions of new prisoners from county jails.[104]  The Governor's order, however, failed to address the fact that hundreds of people will still come and go from the prisons every day, and does not speed up and extend the release of any of the current population.

82.     Neither the Governor nor the IDOC have acted with the urgency or decisiveness that is required to quell this oncoming crisis.  The Governor has not taken any steps to substantially reduce the population or expand IDOC's ability to release, furlough, or transfer to home detention even those who are medically vulnerable.  IDOC has taken only limited steps to this

---

[100]  Executive Order 2020-13 (March 26, 2020), https://www2.illinois.gov/IISNews/21288-Gov._Pritzker_Stay_at_Home_Order.pdf
[101]  *Id.*
[102]  *Id.*
[103]  *Id.*
[104]  *Id.*

end, releasing far fewer than it could even in cases of those who are medically vulnerable and close to the end of the incarceration period anyway.

83.     Even before COVID-19 entered IDOC, activists, community organizers, and civil rights lawyers began advocating for de-population efforts in IDOC to curb the spread.  On March 17, 2020, advocates sent a letter to Governor Pritzker urging him to order IDOC to release individuals who can be released from custody in a way that is consistent with public safety.  The letter outlined a number of specific actions Governor Pritzker should take to protect the vulnerable individuals in IDOC custody, as well as the staff who work there, including: (1) immediately ordering the release of individuals whose release dates are within 120 days; (2) release all individuals in custody awaiting parole revocation hearings; (3) prioritize release for any individuals whose release plans are pending host site approval; (4) order IDOC to stop taking people into custody for parole violations unless they present a clear and present danger of imminent physical harm, and rescind all parole warrants; (5) release individuals with viable clemency petitions; (6) take all actions necessary to maximize good time credits; (7) evaluate individuals who are pregnant, postpartum, or living with their infants in IDOC programs; (8) evaluate individuals with HCU living assignments and chronic care needs for consideration of early release; (9) take steps to limit intake into IDOC facilities; and (10) ensure that the IDOC has the resources necessary to combat a possible COVID-19 outbreak in one or more IDOC facilities.[105]

84.     Illinois law provides several established mechanisms for reducing the prison population, all of which are available to the Governor and Director in this emergency.  The Governor and Director of IDOC have authority pursuant to various Illinois statues to reduce the population in Illinois prisons.  Pursuant to 730 ILCS 5/3-11-1(a)(2), the IDOC may release a person from

---

[105]  March 17, 2020 Letter, Exhibit 6.

prison on medical furlough "to obtain medical, psychiatric or psychological services when adequate services are not otherwise available." The IDOC therefore has statutory authority to release on medical furlough individuals who are medically vulnerable to COVID-19 either due to age or pre-existing medical conditions.

85.     Pursuant to the Electronic Monitoring and Home Detention Law, 730 ILCS 5/5-8A-1 *et seq.* ("Home Detention Law"), IDOC has the authority and obligation to implement procedures through which eligible prisoners may serve a portion or all of their custodial sentence in home detention. The Home Detention Law directs the Department to issue administrative directives to allow for specifically enumerated categories of state prisoners to serve portions of their sentence in home detention. Pursuant to 730 ILCS 5/5-8A-3(d), IDOC may place a prisoner in an electronic monitoring or home detention program if that person is over 55 years old, has 12 months or less to serve on their sentence, has served at least 25% of their sentenced prison term, and is serving a sentence for conviction of an offense other than for certain sex offenses.

86.     Pursuant to 730 ILCS 5/5-8A-3(e), IDOC may place a person of any age serving a sentence for conviction of a Class 2, 3, or 4 felony offense which is not an excluded offense in an electronic monitoring or home detention program at any time.

87.     Pursuant to 730 ILCS 5/5-8A-3(b) and (c), IDOC may place a person of any age serving a sentence for conviction of a Class 1 or Class X felony offense, other than an excluded offense, in an electronic monitoring or home detention program for a period not to exceed the last 90 days of incarceration.

88.     Pursuant to the Administrative Code, 20 Ill. Adm. Code 107.210, the Director of IDOC may award to eligible prisoners up to 180 days of discretionary good conduct credit.

89.     On March 23, 2020, advocates sent a detailed memo to the Governor's office, setting forth further details of who the IDOC could and should be releasing based on these relevant statutes and administrative directives.  This memo emphasized that IDOC should identify and release as many individuals as possible who are medically vulnerable with regard to COVID-19 as well as people who are over the age of 55.  The memo also urged the Governor's Office to order IDOC to immediately, *inter alia*: (1) transfer to home detention and electronic monitoring all eligible people serving sentences for Class 2-4 felonies pursuant to 730 ILCS 5/5-8A-3(e); (2) transfer to home detention and electronic monitoring all eligible people over the age of 55 who have less than 12 months left to serve on their sentence pursuant to 730 ILCS 5/5-8A-3(d); and (3) award discretionary good time credit pursuant to 20 Ill. Adm. Code 107.210 to the furthest extent possible to all eligible individuals to facilitate immediate and continuing releases.[106]

90.     Despite this pressure from advocates, and despite the Governor's own admissions that people in IDOC custody are especially vulnerable to contracting and spreading COVID-19, the IDOC is not utilizing its authority with any degree of urgency to identify and release medically vulnerable prisoners or prisoners who otherwise qualify for early release.

91.     On March 31, 2020, officials publicly announced that IDOC has released around 300 individuals—or less than one percent of the prison population.[107]  This number is far lower than the population reduction needed to protect those who remain in custody and the surrounding

---

[106]  March 23 Letter, Exhibit 7.

[107]  The Governor's Press Conferences are available for streaming at: https://www.nbcchi-cago.com/news/local/watch-live-daily-coronavirus-briefing-from-illinois-health-offi-cials/2234359/ (last visited March 31, 2020).

communities.  Moreover, many who qualify for release and are medically vulnerable remain in custody, including named Petitioners here, putting their lives in jeopardy.

92.     Corrections expert Dan Pacholke has opined that IDOC should "determine who, including those still housed in prisons, and those on work release, is within the categories . . . that IDOC or other body has the legal authority to release or transfer, and establish objective criteria, such as having an appropriate release address, to establish who could safely be released or transferred to a non-prison setting, even though many might still remain in IDOC custody.  the criteria adopted should be designed to significantly reduce the prison population."[108]

93.     If IDOC does not act immediately to reduce its prison population, COVID-19 is likely going to spread rapidly throughout IDOC, overburdening IDOC's medical care program and resulting in likely deaths.[109]

> ### E.  IDOC's Medical Care Program is Gravely Under-Resourced and Under-Functioning, and is Not Capable of Managing COVID-19

94.     Even before COVID-19, IDOC's medical care program was ill-equipped to meet the medical needs of prisoners in its care.  For over a decade, IDOC has been mired in litigation over its consistent failure to maintain a minimally adequate system.  *See Lippert v. Jeffreys*, No. 10 cv 4603 (N.D. Ill.).  In 2014 and again 2018, the *Lippert* court appointed teams of independent experts to conduct exhaustive reviews of IDOC's medical system, both of which exposed a system in dire need of reform.  In October 2018, the team of experts issued a 1200-page report, reaching the following the conclusions:

a)  The clinical care provided within IDOC was "extremely poor" and "resulted in preventable morbidity and mortality";

---

[108]  Pacholke Decl., Exhibit 5.
[109]  Haney Decl., Exhibit 3.

b) IDOC lacked an adequate infections disease control program;

c) IDOC's Infectious Disease Coordinator position was vacant and had been vacant since at least 2014;

d) Systemic sanitation problems existed at multiple IDOC facilities;

e) IDOC's medical staff vacancy rates were "very high" and staffing was a "critical problem" throughout IDOC;

f) Physician staffing at IDOC was "very poor," with "persistent and ongoing vacancies" in site medical director positions, high rates of turnover, and an over-reliance on "traveling" medical directors who go from site to site;

g) Physicians who worked at IDOC were improperly credentialed, which was "a major factor in preventable morbidity and mortality" and "significantly increase[ed] the risk of harm to patients within IDOC."[110]

95.     Less than one year ago, IDOC agreed to a consent decree, which was approved and entered by the Court in May 2019, to begin needed reforms. *See Lippert v. Jeffreys*, No. 10 cv 4603 (N.D. Ill.), Doc. No. 1238 (consent decree). The consent decree called for the appointment of an independent monitor and a near complete overhaul of IDOC's medical system.

96.     In the nine months since the *Lippert* consent decree was entered, IDOC has taken preliminary steps to comply, but circumstances within the facilities remain largely unchanged. IDOC is still only in early stages of developing a compliance plan. There has been no meaningful on the ground change yet; facilities are still critically under-staffed and under-resourced. IDOC is simply unable to adequately meet the serious medical needs of IDOC's population even under non-pandemic circumstances.

---

[110] Exhibit 8 (*Lippert* Expert Report, October 2018) at 9-10, 21-31, 84-91.

97.     Even before the COVID-19 outbreak, in November 2019, the *Lippert* court moni-

tor warned that the prevalence of elderly and infirm individuals in IDOC was straining the sys-

tem.[111]  Regarding this population, the monitor noted: "It is the position of the monitor that in the

short term additional IDOC resources must be directed to properly house and care for this popu-

lation but in the near future the IDOC must take the lead to create a pathway to discharge those

men and women whose mental and medical conditions make them no longer a risk to society to

appropriate settings in the community."[112]

98.     Since the outbreak of COVID-19, IDOC administrators have issued memos to

prisoners notifying them that their medical resources were "stretched thin" and that they needed

to focus "on [their] most vulnerable patients at this time."[113]

99.     As of the date of this filing, there are 48 confirmed COVID-19 cases at Stateville,

with approximately 19 Stateville prisoners in outside hospitals—so many that they overwhelmed

the outside hospital that typically serves Stateville residents.  The situation at Stateville is so

grave that the Governor had to activate Illinois National Guard service members to provide addi-

tional medical support at the prison.[114]  At this point there are no confirmed prisoner cases at any

other prison, but there is no reason to believe that COVID-19 will not reach the other prisons.

Likewise there is no reason to believe that Stateville's tragic outcome will not repeat itself at

other facilities.  The time to act is now.

### F.   Petitioners are Particularly Vulnerable

---

[111]  Exhibit 9 (*Lippert* Court Monitor Report, November 24, 2019) at 9-10.

[112]  *Id.*

[113]  Exhibit 10 (IDOC Memorandum, COVID-19 Response).

[114]  Tina Sfondeles, Illinois National Guard medics headed to Stateville as inmate coronavirus cases rise, Chicago Suntimes (Apr. 1, 2020), https://chicago.suntimes.com/corona-virus/2020/4/1/21202995/coronavirus-covid-19-illinois-prison-stateville-national-guard-field-hospital

100.    Petitioners in this case and individuals who are currently housed in prisons are who are particularly vulnerable to serious illness or death if infected by COVID-19.

101.    James Money (S11097) is 28 years old and is housed at Illinois River Correctional Center in Canton, Illinois.  In 2016, Mr. Money was diagnosed with Stage 3 metastatic thyroid cancer.  He has undergone several surgeries, most recently in January 2020, resulting in the removal of over 80 lymph nodes and a full thyroidectomy, and is now immunocompromised. He was scheduled to begin chemotherapy treatment on March 24, 2020, but IDOC cancelled his treatment, presumably to focus instead on COVID-19.  Mr. Money has already served nearly 5 years of his sentence for residential burglary out of Adams County, and he is currently scheduled to be released on June 19, 2020.  He is eligible for medical furlough pursuant to 730 ILCS 5/3-11-1 and discretionary good time pursuant to 20 Ill. Adm. Code 107.210.  Mr. Money is also within 90 days of his release date, is eligible for release to home detention pursuant to 730 ILCS 5/5-8A-3(b).  Mr. Money's parole conditions have already been determined and he is approved to reside with his fiancée's residence in Warsaw, Illinois.  His fiancée is fully prepared to provide for his medical needs.  Mr. Money is a member of Subclasses 1, 5, and 6.

102.    William Richard (M52774) is 66 years old and lives in the healthcare unit at Dixon Correctional Center.  Mr. Richard has COPD, emphysema, and heart disease, and uses a wheelchair for movement.  His respiratory disease requires continuous oxygen and a breathing treatment two to three times per day.  He shares his roughly 12 feet by 15 feet cell with three other individuals, making social distancing impossible—his bunk is less than 5 feet from his cellmate's bunk, and all four men share a toilet, sink, and the chuckhole through which they receive

their meals. Mr. Richard has less than four months remaining on his sentence, and is eligible un-
der 730 ILCS 5/5-8A-3(d) to transfer to home detention at his mother's home. Mr. Richard is a
member of Subclasses 1, 2, 3, and 6.

103. Gerald Reed (N32920) is housed at the Northern Reception Center. He is 57
years old. Mr. Reed has heart failure, hypertension, and is pre-diabetic. Mr. Reed uses a wheel-
chair for mobility because of a decades-old leg injury that adversely affects his mobility. Within
the last year, Mr. Reed has been hospitalized for a heart attack and for pneumonia. At the NRC,
he is prohibited from accessing commissary and is only provided a single, small bar of soap.
Pursuant to 730 ILCS 5/3-11-1, Mr. Reed is eligible for medical furlough at his mother's home.
Mr. Reed is a member of Subclasses 1 and 2.

104. Amber Watters (Y39454) is 30 years old and is housed at Logan Correctional
Center in Lincoln, Illinois. Ms. Watters has neurological complications from a broken back she
suffered prior to her incarceration in 2019. Prior to her incarceration, Ms. Watters was the pri-
mary caretaker for her three minor children. She is serving two three-year sentences for low
level drug offenses out of Livingston County; a Class 4 sentence for possession of heroin, and a
Class 2 sentence for possession with the intent to distribute a small amount of heroin. Ms. Wat-
ters is scheduled to be released on May 1, 2020, and is eligible under 730 ILCS 5/5-8A-3(e) to
transfer to home detention to her mother's home. Ms. Watters is a member of Subclass 4.

105. Tewkunzi Green (R84568) is housed at Logan Correctional Center in Lincoln,
Illinois. She has asthma and severe hypertension for which she takes multiple medications. In
January 2019, she fainted related to hypertension and was held in the cardiology unit of an off-
site hospital for several days. At Logan, Ms. Green shares a room with three other women. Ms.

Green has a pending commutation petition, which was filed by the January 23, 2020, filing dead-line; her hearing date of April 7, 2020 was postponed and she is now scheduled for a non-public hearing. She is also eligible for medical furlough under 730 ILCS 5/3-11-1. Ms. Green has a stable housing plan in that her mother, who owns her own home in Peoria, Illinois, where she also cares for Ms. Green's 13-year-old son, is willing and able to receive Ms. Green at any time. Ms. Green is a member of Subclass 1.

106. Danny Labosette (B23629) is currently housed at Robinson Correctional Center in Robinson, Illinois. Mr. Labosette is 56 years old and is a double amputee; his left leg has been amputated above the knee, and his right foot has been amputated. Mr. Labosette uses a wheel-chair. Mr. Labosette also has untreated Hepatitis C. Mr. Labosette is housed in the Transitions Unit, a treatment facility within Robinson Correctional Cell. Social distancing is impossible for Mr. Labosette—he resides in a dorm with roughly 20 other men. He sleeps in the bottom bunk of a bunk bed, which is 3 feet away from the neighboring beds. Mr. Labosette has less than six months remaining on his sentence, and is eligible under 730 ILCS 5/5-8A-3(d) to be transferred to home detention at his mother's home in Florida, which has already been modified to accom-modate his disabilities. Mr. Labosette is a member of Subclasses 1, 2, and 3.

107. Carl Reed (R48993) is currently housed at Graham Correctional Center in Hills-boro, Illinois. He is 59 years old and he suffers from chronic kidney disease—requiring dialysis three days per week—diabetes, hypertension, and underlying neurological impairments. A doctor who is an expert in correctional health care has reviewed Mr. Reed's medical records and recom-mends his immediate release for Mr. Reed's health and safety. Mr. Reed has eight years left on his sentence, and he is eligible for medical furlough pursuant to 730 ILCS 5/3-11-1. He has a

pending petition for executive clemency, and he has a stable housing plan for his release: he can live with his sister in Chicago. Mr. Reed is a member of Subclasses 1 and 2.

108.    Carl "Tay Tay" Tate (R12529) is a 40-year-old transgender woman diagnosed with Gender Dysphoria, who is housed at Danville Correctional Center. Ms. Tate has almost six years left of her sentence to serve. Ms. Tate lives with hypertension, for which she takes medication. Ms. Tate also lives with severe anxiety, and the COVID-19 outbreak has only increased her anxiety. She shares a small cell with one other person. Even with current limits on the number of people in the unit who are allowed out of their cells to use the communal dayroom, Ms. Tate estimates that around 24 people may be in the dayroom at a time. She estimates that around 75 people may be in the yard. Ms. Tate also works as a laundry porter, which places her in frequent contact with other prisoners and staff. She has asked for gloves to use, and has been denied. She has also asked for more cleaning supplies to clean the dayroom, including the phones, and has been denied. It is impossible for Ms. Tate to practice social distancing in her living situation. Ms. Tate has a pending clemency petition—which has the support of 40 organizations across the state—and her hearing date of April 7, 2020 was postponed and is being rescheduled. Ms. Tate has a stable housing plan in place for when she is released: she will live with her sister who resides in Lansing, Illinois. Ms. Tate is a member of Subclass 1.

109.    Patrice Daniels (B70662) is 45 years old, serving a life sentence and not eligible for release. He is incarcerated at Joliet Treatment Center. Although this is one of the few facilities that has single occupant cells, he still shares a shower and dayroom with the other residents of this housing unit. Even with current limits on the number of people in the unit who are allowed out of their cells to use the communal dayroom, up to 8 people may be in the dayroom at a time. Mr. Daniels also works as a dietary aide, which places him in frequent contact with other

prisoners and staff from outside of his housing unit each day. Mr. Daniels estimates that even with in-unit meal delivery, each person's meal is handled by approximately 6-8 other people between preparation and delivery. Mr. Daniels describes feeling "like a sitting duck" waiting for the coronavirus to strike. Mr. Daniels is a member of the Class.

110.    Anthony Rodesky (R47057) is currently housed at Pontiac Correctional Center in Pontiac, Illinois. He is 49 years old and has diabetes and other chronic health conditions, and in 2015 he had a below-knee amputation. Mr. Rodesky is a New Jersey prisoner who is in Illinois custody pursuant to an interstate compact agreement between New Jersey and Illinois and he is not eligible for release. Mr. Rodesky has ongoing medical needs, and he must interact with Pontiac health care staff at least twice daily, in order to receive his insulin shots. He also must stand next to other prisoners when he leaves his cell to obtain his insulin shots. Mr. Rodesky is deeply fearful of contracting COVID-19 on account of his pre-existing medical vulnerabilities. Even if Mr. Rodesky is not exposed to COVID-19, an outbreak at Pontiac would drain medical resources at Pontiac that he and other prisoners with chronic health conditions rely on for every day survival. Mr. Rodesky is a member of the Class.

## VI.    CLASS ALLEGATIONS

111.    Petitioners bring this representative habeas action pursuant to 28 U.S.C. § 2254 on their own behalf and on behalf of all persons similarly situated. *See Walker v. O'Brien*, 216 F.3d 626, 633 (7th Cir. 2000) ("Roughly speaking, this makes § 2254 the exclusive vehicle for prisoners in custody pursuant to a state court judgment who wish to challenge anything affecting that custody."). Petitioners seek to represent a class consisting of all people who are currently or

who will in the future be housed in an IDOC prison during the duration of the COVID-19 pandemic. Petitioners' request for release from physical custody is limited to the following six subclasses:

a) *Subclass 1*: People in custody who have serious underlying medical conditions that put them at particular risk of serious harm or death from COVID-19, including but not limited to people with respiratory conditions including chronic lung disease or moderate to severe asthma; people with heart disease or other heart conditions; people who are immunocompromised as a result of cancer, HIV/AIDS, or any other condition or related to treatment for a medical condition; people with chronic liver or kidney disease or renal failure (including hepatitis and dialysis patients); people with diabetes, epilepsy, hypertension, blood disorders (including sickle cell disease), inherited metabolic disorders; people who have had or are at risk of stroke; and people with any other condition specifically identified by CDC either now or in the future as being a particular risk for severe illness and/or death caused by COVID-19, and who are eligible for medical furlough pursuant to 730 ILCS 5/3-11-1.

a) *Subclass 2*: People who are medically vulnerable to COVID-19 because they are 55 years of age and older and who are eligible for medical furlough pursuant to 730 ILCS 5/3-11-1.

b) *Subclass 3*: People who are 55 years of age and older with less than one year remaining on their sentence and eligible for home detention pursuant to 730 ILCS 5/5-8A-3(d).

c) *Subclass 4*: People who are currently in custody for Class 2, 3, or 4 offenses and who are eligible for home detention pursuant to 730 ILCS 5/5-8A-3(e).

d) *Subclass 5*: People who are currently in custody for Class 1 or Class X offenses with less than 90 days remaining on their sentence and eligible for home detention pursuant to 730 ILCS 5/5-8A-3(b) and (c).

e) *Subclass 6*: People who are scheduled to be released within 180 days and eligible to receive sentencing credit pursuant to 20 Ill. Adm. Code 107.210 - Discretionary Sentence Credit.

112. A representative action may be maintained to pursue habeas claims. *Bijeol v. Benson*, 513 F.2d 965, 967 (7th Cir. 1975); *see also Reno v. Flores*, 507 U.S. 292 (1993) (class action seeking relief pursuant to 28 U.S.C. § 2241); *U.S. ex rel. Morgan v. Sielaff*, 546 F.2d 218, 221 (7th Cir. 1976); *U.S. ex rel. Green v. Peters*, 153 F.R.D. 615, 617 (N.D. Ill. 1994) (granting class certification in habeas context, noting that "the obvious undesirability of a large number of individual petitioners clamoring for preference in the allocation of scarce resources… counsels strongly in favor of certification"). Although Rule 23 does not apply to habeas proceedings, the principles of Rule 23 provide guidance for evaluating when to allow such representative actions. All of the principles suggest that a representative action is appropriate here.

113. A representative action is the only practicable means by which the individual named Petitioners and the class members can challenge the Respondent's unconstitutional actions. Many members of the class are without the means to retain an attorney to represent them in a habeas petition.

114.    The class and subclasses are so numerous that joinder of all members is impracti-

cal.  The number of people in custody exceeds 36,000 on any given day, and each subclass con-

tains hundreds, and sometimes thousands, of people.  Subclass 1 contains approximately 12,000

who live with one or more medical vulnerability.  Subclass 2 contains 4,807 people who are

medically vulnerable to COVID-19 because they are 55 and older.  Subclass 3 contains 700 peo-

ple who are over age 55, have less than one year left on their sentence, and are eligible for trans-

fer to home detention.  Subclass 4 contains over 9,000 people who are currently in custody for

Class 2, 3, or 4 offenses and eligible for transfer to home detention.  Subclass 5 contains 2,401

people who are currently in custody for Class 1 or Class X offenses with less than 90 days re-

maining on their sentence and eligible for transfer to home detention.  Subclass 6 contains 5,308

people who are eligible to be released in six months.

115.    There are questions of law and fact common to all class members and the sub-

class, including: (1) does COVID-19 present a substantial risk of harm to people in the custody

of the Illinois Department of Corrections; (2) does the Respondent have available to him

measures that could reduce the number of people living in IDOC prisons, including those who

are especially vulnerable to COVID-19; and (3) has the Respondent failed to act reasonably to

mitigate the spread of COVID-19 and protect those in custody who are most vulnerable by not

fully utilizing furlough, home detention, and mechanisms to reduce the prison population?

116.    The claims of the named Petitioners are typical of those of the class as a whole.

That typicality stems from their claim that Respondent has placed them at significant risk of

harm by failing to take appropriate steps to address the risk of COVID-19 throughout the IDOC.

Every single person in IDOC custody faces the same risk of contracting COVID-19 if the IDOC

fails to take meaningful action to reduce the in-custody population. While members of Sub-classes 1-2 have an increased risk of serious health complications and death as result of the threat of COVID-19 and Subclasses 3-6 suffer due process violations, the overarching nature of the threat of COVID-19 to every person confined in IDOC custody is sufficient to satisfy typicality.

117. The individual named Petitioners will fairly and adequately represent the inter-ests of the class and subclasses. The named Petitioners have no conflicts with the unnamed members of the proposed class. In addition, their lawyers are experienced in federal court civil rights class actions, particularly those involving prisons and jails.

118. Respondent has refused to act in a manner that applies generally to the class as a whole, rendering class-wide injunctive and declaratory relief appropriate.

## VII. LEGAL CLAIMS

## A. SECTION 2254 IS AN APPROPRIATE VEHICLE TO ADDRESS PETITION-ERS' CLAIMS FOR RELIEF

119. Habeas corpus is the appropriate instrument to obtain release when the core grievance is that the petitioner is being unlawfully subjected to physical restraint. *Preiser v. Ro-driguez*, 411 U.S. 475, 486, (1973). Section 2254 allows this Court to grant habeas corpus relief when a state prisoner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see also Walker v. O'Brien,* 216 F.3d 626, 633 (7th Cir. 2000) ("Roughly speaking, this makes § 2254 the exclusive vehicle for prisoners in custody pur-suant to a state court judgment who wish to challenge anything affecting that custody.").

120. A prisoner's custody may violate the constitution when the physical restraint of imprisonment itself presents an imminent risk to the health and life of the individual. *See Roba v. United States*, 604 F.2d 215, 219 (2d Cir. 1979) (holding that prisoners' "right not to be forci-bly transported by government officials" while gravely ill was cognizable in habeas corpus); *see*

*also Preiser*, 411 U.S. at 499 (leaving open the possibility that Section 2254 could be used to challenge conditions of confinement that render otherwise lawful custody unconstitutional).

121.    Here, while Petitioners' claims are rooted in the risk to their health posed by COVID-19, a "quantum" change in Petitioners' custody is the only action sufficient to address the particular risk of harm they face as a result of their physical confinement in IDOC facilities. *See Glaus v. Anderson*, 408 F.3d 382, 387-88 (7th Cir. 2005).

122.    Habeas corpus is the appropriate instrument even when prisoners seek something "less than complete freedom." *Maleng v. Cook,* 490 U.S. 488 (1989); *Graham v. Broglin*, 922 F.2d 379, 381 (7th Cir. 1991) ("If the prisoner is seeking what can fairly be described as a quantum change in the level of custody… then habeas corpus is his remedy."). Here, while all Petitioners do not necessarily seek total release from IDOC custody, Petitioners do seek urgent release from prison facilities, whether by medical furlough or transfer to home detention on electronic monitoring. Both would arguably constitute a "quantum change in the level of custody."

123.    Transfer to home detention, medical furlough, and the awarding of good time credit sufficient for release are the *only* remedies sufficient to address the urgent violations of Petitioners' constitutional rights. The inherent structure of prison facilities and nature of prison life makes social distancing utterly impossible, and no lesser remedy can adequately mediate the risk that imprisonment poses to Petitioners at this time.

**B. IDOC'S Failure to Take Steps to Mitigate Transmission of COVID-19 Constitutes Deliberate Indifference to the Serious Risk of Harm to Petitioners**

124.    Respondent is violating Petitioners' Eighth Amendment rights by continuing to incarcerate them in conditions where it is virtually impossible to take steps to prevent transmission of an infectious disease that will prove deadly because of Petitioners' vulnerable condition and/or age. The reach of the Eighth Amendment includes "exposure of inmates to a serious,

49

communicable disease." *Helling v. McKinney*, 509 U.S. 25, 33 (1993); *see also Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) ("correctional officials have an affirmative obligation to protect [forcibly confined] inmates from infectious disease").

125.    All people held in the Illinois Department of Corrections are entitled to be protected from conditions of confinement that create a serious risk to health or safety, including through release from custody when necessary. *Brown v. Plata*, 563 U.S. 493, 531-32 (2011) (upholding lower court's order releasing people from state prison even though release was based on prospect of future harm caused by prison overcrowding); *see also Farmer v. Brennan*, 511 U.S. 825, 834 (correctional official violates Eighth Amendment by consciously failing to prevent "a substantial risk of serious harm"); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ("deliberate indifference" to serious medical needs violate the Eighth Amendment); *French v. Owens*, 777 F.2d 1250, 1252 (7th Cir. 1985) ("Prison conditions could be cruel and unusual when they deprive inmates of the minimal civilized measure of life's necessities or when they result in punishments that involve the unnecessary and wanton infliction of pain or are grossly disproportionate to the severity of the crime." (citations omitted)).

126.    The risk of exposure to a deadly infectious disease such as COVID-19 constitutes a serious risk to health, particularly for the Petitioners and the vulnerable class members described herein. *Helling v. McKinney*, 509 U.S. 25, 34 (1993) (noting with approval Eighth Amendment claims based on exposure to serious contagious diseases). Under IDOC's current conditions, Respondent has not and cannot protect Petitioners and the class from this risk of serious harm. In these circumstances, release is the only means of protecting Petitioners and the class they seek to represent from unconstitutional treatment.

127.    Government officials act with deliberate indifference when they "ignore a condi-

tion of confinement that is sure or very likely to cause serious illness and needless suffering the

next week or month or year," even when "the complaining inmate shows no serious current

symptoms." *Helling*, 509 U.S. at 33.  This Court need not "await a tragic event" to find that Re-

spondent is maintaining unconstitutional conditions of confinement. *Id.*  Instead, showing that

the conditions of confinement "pose an unreasonable risk of serious damage to [Petitioners'] fu-

ture health" is sufficient.  *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting

*Helling*, 509 U.S. at 35) (alteration omitted); *see also, Jabbar v. Fischer*, 683 F.3d 54, 57 (2d

Cir. 2012) (incarcerated people "may not be exposed to conditions that pose an unreasonable risk

of serious damage to [their] future health") (citation and internal quotation marks omitted).

128.    Here, Petitioners face a substantially increased risk of exposure to COVID-19,

with the attendant risk of death that follows given their vulnerable conditions and/or age, because

of Respondent's failure to take meaningful and accessible steps to reduce the prison population.

Respondent is well aware of this risk; in a March 30, 2020 press conference, the Director of the

Illinois Department of Public Health Dr. Ngozi O. Ezike noted that:

> Congregate settings such as Stateville. . . pose unique challenges in stopping the
> spread of disease and protecting the health of individuals who live and work there.
> Those who are incarcerated live and work and eat and study and recreate all
> within that same environment, heightening the potential for COVID-19 to spread
> quickly once it's introduced.

Dr. Ngozi O. Ezike, March 30, 2020 Briefing.  More crucially, Dr. Ezike noted that there

are simply not enough cells in the Illinois prison system to allow sick prisoners to appropriately

isolate.  *Id*. ("Some correctional facilities do not have enough individual cells [to allow for quar-

antine of sick inmates].").

51

129.    Release of all or some of the class members is the only remedy sufficient to rem-

edy this constitutional violation.  Without a substantial reduction in the prison population, Re-

spondent is unable, by the admission of the Director of the Illinois Department of Public Health,

to prevent or even mitigate the spread of COVID-19 throughout the prison.

### C.   IDOC'S Failure to Implement Illinois's Home Detention Law Violates the Due Process Clause.

130.    Respondent has further violated the Due Process rights of Petitioners in Sub-

classes 3, 4, and 5 by failing to implement statutorily-created mechanisms that would allow the

Department of Corrections to transfer them to home detention.  Inmates have a liberty interest in

regulations that affect conditions of confinement, such as good-time credit.  *Jones v. Cross*, 637

F.3d 841, 845 (7th Cir. 2011).  "A cognizable liberty interest may arise from the Constitution,

statutes, or regulations."  *Murphy v. Raoul*, 380 F.Supp.3d 731, 760 (N.D. Ill. 2019) (citing *Felce*

*v. Fiedler,* 974 F.2d 1464, 1488 (7th Cir. 1992) and *Williams v. Lane,* 851 F.2d 867, 879–80 (7th

Cir. 1988)).  As is the case here, "a state may create such an interest by state law." *Felce*, 974

F.2d at 1490.  If the language and structure of the statutes in question create an expectancy of re-

lease, they create a liberty interest.  *See Montgomery v. Anderson*, 262 F.3d 641, 644 (7th Cir.

2001); *Taylor v. Edgar*, 52 F. App'x 825, 826–27 (7th Cir. 2002).  Here, Respondent has failed to

implement Illinois's Electronic Monitoring and Home Detention Law, 730 ILCS 5/5-8A-1 *et*

*seq.*, in violation of Petitioners' Due Process rights.

131.    Through the Electronic Monitoring and Home Detention Law, 730 ILCS 5/5-8A-

1 *et seq.* ("Home Detention Law"), the Illinois Legislature created mechanisms through which

state prisoners could be transferred to home detention.  Section (e) of that statute allows transfer

to home detention for anyone serving a sentence for a Class 2, 3, or 4 felony:

> (e) A person serving a sentence for conviction of a Class 2, 3, or 4 felony offense which is not an excluded offense may be placed in an electronic monitoring or home detention program pursuant to Department administrative directives.

730 ILCS 5/5-8A-3(e).  Section (d) of the same statute provides for electronic monitoring or home detention of prisoners who are over the age of 55, have served more than 25% of their sentence, have not been convicted of an excludable offense, and have less than 12 months of remaining incarceration.  *See* 730 ILCS 5/5-8A-3(d).  Section (b) and (c) of the statute provides for electronic monitoring or home detention of prisoners who have been convicted of a Class X or Class 1 felony, have not been convicted of an excludable offense, and have less than 90 days of remaining incarceration.  *See* 730 ILCS 5/5-8A-3(b)-(c).

132.     The Home Detention Law implicitly and explicitly orders the Department to create directives allowing for transfer to home detention.  730 ILCS 5/5-8A-3(e) ("These directives *shall* encourage inmates to apply for electronic detention to incentivize positive behavior and program participation prior to and following their return to the community, consistent with Section 5-8A-4.2 of this Code." (emphasis added)).  Through its mandate, the statute creates enforceable rights to be included for consideration for home detention.  *Id.* ("These directives *shall* not prohibit application solely for prior mandatory supervised release violation history, outstanding municipal warrants, current security classification, and prior criminal history, though these factors may be considered when reviewing individual applications in conjunction with additional factors, such as the applicant's institution behavior, program participation, and reentry plan." (emphasis added)).  Through its repeated orders to the Department—including orders that "these directives *shall* contain certain provisions—the Illinois Legislature has created an enforceable liberty interest in the Home Detention Law.

133.     Here, Respondent has taken no steps to implement the Home Detention Law; despite the plain language of the statute, eligible prisoners have no mechanism for seeking release or even consideration for home detention.

134.     When a petitioner alleges that a state's action—or inaction—violates the Due Process Clause, courts ask two questions: (1) whether there exists a liberty or property interest of which a person has been deprived, and if so, (2) whether the procedures followed by the State were constitutionally sufficient.  *See Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 460 (1989).

135.     Here, there is no question that Petitioners have been deprived of a liberty interest. The Supreme Court has repeatedly held that prisoners have a liberty interest in quantum changes in the conditions of confinement, such as probation, parole, and mechanisms for changes in confinement such as good time.  *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (circuit court's holding that petitioners have a liberty interest in parole is consistent with Supreme Court law); *Board of Pardons v. Allen*, 482 U.S. 369, 373–381 (1987); *Greenholtz v. Inmates of Neb. Penal and Correctional Complex,* 442 U.S. 1, 12 (1979); *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974) (recognizing a liberty interest in good time credit).  Like restrictions on probation, parole, or good-time credit, Petitioners' inability to access the statutorily-created home detention law "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

136.     Given that Petitioners have been deprived of a liberty interest, this Court must next consider whether the procedures followed by Respondent are constitutionally sufficient. *Swarthout*, 562 U.S. at 220 ("When, however, a State creates a liberty interest, the Due Process Clause requires fair procedures for its vindication—and federal courts will review the application

of those constitutionally required procedures."). Here, there is simply no procedure in place. Respondent has taken no steps to implement the Home Detention Law, effectively blocking any path to obtain the liberty created by statute. Respondent's utter failure to create procedures by which Petitioners can access this statutorily created right is constitutionally insufficient. *See, e.g.,Salcido ex rel. Gilliland v. Woodbury Cty., Iowa*, 119 F. Supp. 2d 900, 925 (N.D. Iowa 2000) (absence of procedure for determining payment of involuntarily committed person, thereby limiting placement options, was constitutionally sufficient to protect liberty interest in placement).

## VIII. PRAYER FOR RELIEF

WHEREFORE, Petitioners respectfully request that the Court order the following relief:

a) Immediate medical furlough for members of Subclass 1: People in custody who have serious underlying medical conditions that put them at particular risk of serious harm or death from COVID-19, including but not limited to people with respiratory conditions including chronic lung disease or moderate to severe asthma; people with heart disease or other heart conditions; people who are immunocompromised as a result of cancer, HIV/AIDS, or any other condition or related to treatment for a medical condition; people with chronic liver or kidney disease or renal failure (including hepatitis and dialysis patients); people with diabetes, epilepsy, hypertension, blood disorders (including sickle cell disease), inherited metabolic disorders; people who have had or are at risk of stroke; and people with any other condition specifically identified by CDC either now or in the future as being a particular risk for severe illness and/or death caused by COVID-19, and who are eligible for medical furlough pursuant to 730 ILCS 5/3-11-1;

b) Immediate medical furlough to members of Subclass 2: People in custody who are medically vulnerable to COVID-19 because they are 55 years of age and older and who are eligible for medical furlough pursuant to 730 ILCS 5/3-11-1.

c) Immediate transfer to home detention of members of Subclass 3: People in custody who are 55 years of age and older with less than one year remaining on their sentence and eligible for home detention pursuant to 730 ILCS 5/5-8A-3(d).

d) Immediate transfer to home detention of members of Subclass 4: People who are currently in custody for Class 2, 3, or 4 offenses and who are eligible for home detention pursuant to 730 ILCS 5/5-8A-3(e).

e) Immediate transfer to home detention of members of Subclass 5: People who are currently in custody for Class 1 or Class X offenses with less than 90 days remaining on their sentence and eligible for home detention pursuant to 730 ILCS 5/5-8A-3(b) and (c).

f) An immediate aware of 180 days of sentencing credit to members of Subclass 6: People in custody who are scheduled to be released within 180 days and eligible to receive sentencing credit pursuant to 20 Ill. Adm. Code 107.210.

g) Grant such other relief as this Court deems just and proper.

Petitioners seek an emergency hearing on this motion.

Respectfully submitted,

By: /s/ Vanessa del Valle
    One of the Attorneys for the Petitioners

Sheila A. Bedi
Luke Fernbach*
Emily M. Grant*
Terah Tollner*
Community Justice Civil Rights Clinic
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-2492
sheila.bedi@law.northwestern.edu
LukeFernbach2021@nlaw.northwestern.edu
EmilyGrant2021@nlaw.northwestern.edu
ttollner@nlaw.northwestern.edu
 * Law student licensed pursuant to Illinois
Supreme Court Rule 711

Vanessa del Valle
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-5932
vanessa.delvalle@law.northwestern.edu

Alan Mills
Elizabeth Mazur
Uptown People's Law Center
4413 N. Sheridan
Chicago, IL 60640 (773) 769-1411
alan@uplcchicago.org
liz@uplcchicago.org

Jennifer Soble
Illinois Prison Project
53 W. Jackson, Suite 1056
Chicago, IL 60616
(312) 324-4465
jennifer@illinoisprisonproject.org

Amanda Antholt
Samantha Reed
Equip for Equality
20 N. Michigan Ave, Suite 300
Chicago, IL 60602
(312) 341-0022
amanda@equipforequality.org
samantha@equipforequality.org

Sarah C. Grady
Loevy & Loevy
311 North Aberdeen St., 3rd Fl.
Chicago, IL 60607
(312) 243-5900
sarah@loevy.com

*Counsel for Petitioners*